## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

JAMES WONG and SUZANNE HOY,
    *Plaintiffs*,

    v.

BOARD OF EDUCATION,
    *Defendant*.

No. 3:16-cv-1873 (VAB)

## RULING AND ORDER ON CROSS-MOTIONS FOR
## JUDGMENT ON THE ADMINISTRATIVE RECORD

On October 17, 2016, James Wong and Suzanne Hoy ("Plaintiffs" or "Parents") filed a lawsuit against the Board of Education of Southington, Connecticut ("Southington"), alleging that Southington violated their son's ("Student") right to a free appropriate public education ("FAPE") under the Individuals with Disabilities Education Act, 20 U.S.C. § 1400 *et seq.* ("IDEA"); the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA"); and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a) ("Section 504"). Notice of Removal, ECF No. 1 (Nov. 15, 2016).

This action is an administrative appeal of a due process hearing officer's decision, dated September 1, 2016, in *Student v. Southington Board of Education*, Case No. 16-0517 ("Final Decision"), which found that Southington provided Student with a FAPE for the 2013-2014 school year (from the period of May 10, 2014 to the end of the school year); the 2014-2015 school year; the 2015-2016 school year; and the 2016-2017 school year. Final Decision Case No. 15-0517, *Wong v. Southington*, ECF No. 90-1 at 29 (Sept. 1, 2016) ("Final Decision").

Both Plaintiffs and Southington have moved for judgment on the administrative record.

For the following reasons, Plaintiffs' motion is **DENIED** and Southington's motion is **GRANTED.**

## I.     BACKGROUND

### A. Administrative Complaint

On May 9, 2016, Plaintiffs filed a Request for Impartial Special Education Hearing for Southington's alleged denial of a FAPE for Student, "leaving the parent[s] with no alternative but to write a letter of 'Unilateral Placement at Public Expense' to Southington Catholic School." Request for Impartial Special Education Hearing, ECF No. 90-1 at 5 (May 9, 2016) ("Hearing Request"). Plaintiffs alleged, *inter alia*, that:

- Southington denied Student his rights under Section 504 and the ADA by identifying him "late" as a "twice exceptional Gifted Disabled child." *Id.*

- Southington denied Student an appropriate Individualized Education Plan ("IEP"). *Id.* at 5–6.

- Southington did not hold adequate Planning and Placement Team ("PPT") meetings, nor did school staff "come prepared to the August [2015] PPT." *Id.* at 6.

- Student "additionally suffered discrimination as a twice exceptional gifted disabled 'Asian Student of Color' and was harassed by" school staff. *Id.*

- Southington denied Student an "accessible curriculum for both of his sixth and seventh grade years after having been forced to struggle with his visual disability that the [] elementary school staff failed to [i]dentify[.]" *Id.*

- School administrators "systematically harassed the student and the parents causing great pain, unnecessary stress, humiliation, embarrassment, harm, loss of time, loss of educational hours and financial damages." *Id.*

- School administrators retaliated against Plaintiffs for their unilateral placement by 1) "stripp[ing] the Service Plan completely from the items that it had contained even those

that would not have cost any money" and 2) "den[ying] [Student] of the 'door to door bus service' that had been provided for [sixth] and [seventh] grade and continued as per written in his IEP for [eighth] grade." *Id.*

- Southington failed to 1) schedule and pay for prescribed vision therapy; 2) "provide timely triennial testing even after this was requested by the Catholic Schools for High School Transitional Planning"; 3) hold a PPT after the Plaintiffs' "multiple requests and notification that the SpEd had stripped the IEP of the student's needed testing accommodations"; 4) "coordinate the requisite testing accommodations for the PSAT"; 5) "keep to their commitment to send in someone to train the teachers at Southington Catholic once a month in Executive Functioning training." *Id.* at 6–7.

Plaintiffs proposed the following as a resolution with Southington:

- reimbursement for all costs associated with Plaintiffs' unilateral placement of Student at Southington Catholic School, *id.* at 7, including for "mileage and driver's time for door to door service for [half] of school year," *id.* at 8;

- compensation for "tuition reimbursement . . . for years lost of Middle School appropriate education with four years of High School tuition," *id.* at 7;

- "Compensatory Services for not providing appropriate executive functioning services and handwriting/cursive . . . in the IEP," including summer tutoring, *id.*; and

- "More frequent Vision Therapy sessions throughout the summer with transportation to and from the 4D Vision Gym in Cromwell to be continued until cured," *id.*

### B. The Hearing Officer's Decision

On June 13, 2016, Hearing Officer Janis C. Jerman ("Hearing Officer Jerman") held a telephonic pre-hearing conference. Final Decision and Order, ECF No. 90-1 at 10 (Sept. 1, 2016)

("Final Decision"). After previously ruling on a motion to dismiss—where she dismissed certain

allegations for lack of subject matter jurisdiction, standing, ripeness, or falling outside the two

year statute of limitations—Hearing Officer Jerman identified seven issues to resolve:

1. Did Southington provide Student with a FAPE for the 2013-14 school year from the period May 10, 2014 to the end of the school year?

2. Did Southington provide Student with a FAPE for the 2014-15 school year?

3. Did Southington provide Student with a FAPE for the 2015-16 school year?

4. Did Southington provide Student with a FAPE for the 2016-17 school year?

5. If Southington didn't provide Student with a FAPE, is Student's unilateral private placement appropriate?

6. If the answer to #5 is in the affirmative, are Student's Parents entitled to reimbursement for the cost of the unilateral private placement

7. If the answer to the first four questions are in the negative, what shall be the remedy?

*Id.* at 10–11. Throughout the underlying administrative hearings, Plaintiffs appeared on behalf of

Student, without counsel. *Id.* at 10.

Hearing Officer Jerman presided over four hearing dates, two days for each side to

present their case, on July 18, 2016; July 26, 2016; July 27, 2016; and August 17, 2016. *Id.* at 11.

On September 1, 2016, Hearing Officer Jerrman issued her Final Decision and Order

("Final Decision"). *Id.* at 10–31. She made fifty-eight findings of fact and thirteen conclusions of

law. *Id.*

On December 20, 2012, during his fifth-grade year, Southington found Student eligible

for special education services under the primary disability of Specific Learning Disability

("SLD"). *Id.* at 12. Parents participated in the Planning and Placement Team ("PPT") meeting to

develop an Individualized Education Program ("IEP") for Student. *Id.*

During 2013, the PPT met several times to revise Student's IEP, including after an

4

occupational therapy screener indicated that Student wasn't meeting grade level expectations for writing. *Id.* The PPT also incorporated recommendations from an independent psychological evaluation of Student and an optometrist. *Id.* Some of the PPT's recommendations, such as counseling and completion of behavior rating scales, were denied by Parents. *Id.*

At the January 30, 2014 PPT meeting, which was Student's annual review, Parents requested changing Student's primary disability designation from SLD to Visual Impairment. *Id.* at 13. The PPT declined "based on the Federal Register definition of Visual Impairment and based on the [Board of Education and Services for the Blind ("BESB") consultant's] report and recommendations." *Id.* Despite not meeting the criteria, Southington "provided services and accommodations to meet his vision needs, including assistive technology and [occupational therapy]." *Id.* The IEP also provided Student "access to a software program that converts speech to text and vice versa." *Id.* at 14.

Applicable to all school years, Hearing Officer Jerman found:

> The credible evidence supports a finding that Parents were invited to all PPT meetings; had an opportunity to ask questions, present recommendations, and invite advocates or other relevant professionals to participate; that certain of their requests were implemented; and that they had time at PPT meetings and before IEPs were implemented to raise additional concerns. There is also credible evidence that the PPT convened regularly at Parents' request. . . .
>
> The [IDEA] requires [Southington] to have an IEP in effect at the beginning of each school year for each child with a disability. The credible evidence supports a finding that BOE had an IEP in effect for Student the beginning of each school year at issue in this case. . . . that PPT decisions were not based on funding but were based on providing Student with FAPE. For example at Parents' request, BOE purchased an expensive software package for Student that was not in use elsewhere in the district. . . . the services, supports and accommodations were tailored to Student's needs. . . . Parents did not produce evidence that any of their advocacy or complaints against [Southington] officials in any way impacted Student's

educational program or the provision of FAPE.

*Id.* at 19–21. Hearing Officer Jerman also highlighted testimony that school administrators "working directly with Student and his educational program did not witness any bullying, harassment, or discrimination or receive complaints of such," and that credible evidence in the record supports the finding that "any frustration felt about Parents' advocacy had no negative impact on Student's education." *Id.* at 21. As discussed more specifically below, she found that Southington provided a FAPE to Student for all four academic years at issue.

### i. 2013-2014 Academic Year

Hearing Officer Jerman first found that, "[d]ue to the statute of limitations, the scope of this issue is limited to the short time from May 10, 2014 to the end of the school year in June 2014." *Id.*

On May 19, 2014, Parents and Southington agreed to participate in a facilitated IEP: Southington staff members of the PPT "felt that Parents were not satisfied no matter what they did and thought that an independent facilitated PPT meeting might improve the relationship and make Parents satisfied." *Id.* at 14.

Parents made numerous allegations related to Student's sixth grade curriculum not being accessible to him, but the Hearing Officer found that Southington provided Student a FAPE for the relevant time period, and described Student's IEP[1] in place from May 10, 2014 to the end of

---

[1] The IEP included, *inter alia*:

> Goals and objectives to address written expression . . . Five hours per week Language Arts support . . . Three hours per week Math support . . . Two hours per week Science support . . . 3.83 hours per week support study in lieu of Social Studies. . . . One hour per week organizational skills support . . . 46 minutes support study every 3 days Unified Arts rotation per Parents' request for no Family/Consumer Science . . . Online Science resources . . . Google Read/Write Text Help installed on laptop provided to Student . . . Google Voice Extension . . . Continue use enlarged font for all music sheets . . . Continue to reinforce Student's expected use of large font and brightness contrast provided for reading

the school year. *Id.* at 21–22.

Specifically, Hearing Officer Jerman found that "Special Education Coordinator 1 credibly testified that the PPT solicited Parents' input, incorporated recommendations from evaluators, reviewed present levels of performance, and discussed and updated Student's services to meet his needs." *Id.* at 22. She concluded that Student's IEP for this period "included appropriate recommendations and accommodations tailed to [his] needs and was implemented in an inclusion setting." *Id.*

### ii.   2014-2015 Academic Year

For this year, Student's IEP remained the same as the prior years, and included the following changes: "Language Arts support reduced from five to three hours per week due to no double block . . . [and] [e]limination of 46 minutes support study during Unified Arts per Parents' request." *Id.* at 23. At the end of his sixth-grade year, Student's grades ranged from B+ to A+. *Id.*

On September 25, 2014, the PPT met at Parents' request and adopted additional recommendations[2], which was implemented into a revised IEP. *Id.* Southington also ordered a laptop and software for Student, which was delivered to him on November 3, 2014. *Id.* Parents allege this took too long, but the Hearing Officer found that the delay was due to the required laptop not being "readily available" and then needing to be "specially configured." *Id.*

---

materials and his wearing of eyeglasses . . . Continue to receive extended time for all tests, projects, and timed work  . . . Continue providing Student with a second set of books for home use . . . the PPT declined Parents' request for direct handwriting skills, including cursive writing . . . .

Final Decision at 22.

[2]The Hearing Officer detailed these fifteen recommendations, which ranged from "teacher will email parents same day that Student is missing a homework assignment" to "accommodations for Smarter Balanced Field Test to meet his vision needs[.]" *Id.* at 23.

Following an incident on December 4, 2014, Student was suspended for three days. *Id.* at 24. Late that Friday afternoon, Student had "removed [from a teacher's computer] a flash-drive," which contained "information regarding [other students'] disabilit[ies] and individualized educational program[s]." Letter from Assistant Principal, ECF No. 90-5 at 29 (Dec. 9, 2014). The flash-drive "was recovered without incident," *id.*, and Student was also later dismissed from the National Junior Honor Society due to his "flagrant violation of school rules or the law," Letter from NJHS Adviser, ECF No. 90-5 at 32 (Jan. 15, 2015). [3]

On January 16, 2015, the PPT met for Student's annual review, as originally scheduled, but Parents did not attend. Final Decision at 24.

On March 27, 2015, a second PPT meeting was held so that Parents could attend. *Id.* This PPT was facilitated and lasted three hours, and Parents—who were represented by an attorney at that time—had an opportunity to discuss their concerns with Southington staff. *Id.* Along with other updates[4] to the IEP, Parents also agreed to a private neuropsychological evaluation for Student. *Id.* This IEP was designed to support Student through the remainder of the seventh grade and to be carried over to the eighth grade. *Id.*

Although Parents agreed to all the IEP provisions, they later complained that the five day extension for completing assignments was "not reasonable" and "arbitrary." *Id.* at 25 They "did

---

[3] Although the letter is dated January 15, 2014 and not 2015, the Court assumes this is a scrivener's error.

[4] The March 27, 2015 IEP provided for, *inter alia*:

> Student's planner [to] be in an electronic format . . . daily announcements to be embedded in electronic checklist . . . see Literacy Specialist one-on-one three days a week for 46 minutes focusing on writing support, organization, and executive functioning skills . . . Math support in an inclusion setting three hours a week . . . continue to enlarge worksheets to size 14 font or larger . . . continued use of laptop and related software . . . five day extended deadline for homework . . . graph paper to be included in binder.

*Id.* at 24.

not offer a specific time frame but felt that it should be open-ended." *Id.* Hearing Officer Jerman found that "[g]iven the supports, services, and modifications provided to Student, as well as his present levels of performance, the five-day period is reasonable." *Id.* At the end of seventh grade, Student's grades ranged from B- to A+, even with enrollment in Advanced Algebra, "a more rigorous curriculum than regular math." *Id.*

The Hearing Officer concluded that during the 2014-2015 school year, "Student's IEPs included appropriate recommendations and accommodations tailored to [his needs] and were implemented in an inclusion setting," and that Southington provided him with a FAPE. *Id.*

### iii.  2015-2016 Academic Year

On May 4, 2015, as provided by the March 27, 2015 IEP, Student had a neuropsychological examination. *Id.*

On August 20, 2015, after receiving the evaluator's report, the PPT convened for two hours to review the results and recommendations, and adjust Student's IEP as necessary. *Id.* The Hearing Officer found that Student was "making meaningful progress" with the support he received. *Id.* The PPT also changed Stduent's primary disability category from SLD to OHI-ADD/ADHD, or Other Health Impairment-Attention Deficit Disorder/Attention Deficit Hyperactivity Disorder. *Id.* The Hearing Officer found that Parents did not object to this change, and the only concern they raised was to request vision therapy, which was again denied. *Id.* at 26. Parents did not provide medical records or diagnosis indicating that Student met the definition of visual impairment. *Id.* at 25. Hearing Officer Jerman also found that the updates to

Student's IEP[5] were consistent with the evaluator's recommendation.

At the end of this PPT, Parents "read a prepared statement indicating that they intended to unilaterally place Student at a parochial school." *Id.* at 26. Southington refused this request. *Id.* Student did not attend eighth grade with Southington. *Id.* Mr. Wong testified that their "concern was not with the IEP itself but 'with the people' at [Southington]." *Id.*

The Hearing Officer found that Student's proposed IEP were tailored to Student's needs, and that the IEP's goals, objectives, and accommodations directly addressed his "weaknesses . . . in executive functioning, organizing his work, and planning how long a task will be." *Id.* Southington participated in development of a service plan for Student while unilaterally placed at Southington Catholic School, and received updates about Student from Southington Catholic School's staff, whose observations "were not contrary to [Southington's] observations and experience." *Id.* She concluded that Southington offered Student a FAPE for the 2015-2016 school year. *Id.*

### iv.  2016-2017 Academic Year

On June 3, 2016, the PPT met to plan Student's ninth grade IEP. *Id.* Staff from Southington Catholic School attended and shared their observations of Student's performance. *Id.* The PPT determined that Student was eligible for special education under the primary

---

[5] The August 20, 2015 IEP provided for the same accommodations as before, with some changes to reflect the recommendation in the neuropsychologist's report, and:

> discontinued Math goal; add academic support class three hours per week . . . [c]ontinue specialized transportation . . . [r]ecommend counseling supports for social skills . . . (Parent refused counseling) . . . [r]reconvene in December 2015 for annual and triennial review . . . [p]rovide Student with seven days beyond original due date for missed homework assignments . . . [c]ontinue home/school electronic communication.

*Id.* at 25–26.

disability category of OHI-ADD/ADHD. *Id.*

The Hearing Officer found that this IEP[6] also addressed Student's visual and executive functioning needs. *Id.* at 27. In addition, she highlighted specific accommodations that helped with Student's visual issues, and noted that many of the supports were ones that "Student had in previous IEPS and which were shown to be successful." *Id.* at 27–28.

Hearing Officer Jerman found:

> Student's executive functioning deficit is his greatest weakness. His low processing speed may be average for other students but is low for him based on his high intellectual capacity. . . . Many of the accommodations help with Student's executive functioning needs . . . All of the services and accommodations, which take into consideration evaluations and recommendations, will help him because they are tailored to his needs and learning style and because he is a bright child. . . . The parochial school staff who were present were in agreement that the IEP reflects Student's present levels of performance and his needs. . . . Student continues to progress for his age and grade.

*Id.* at 28.

Hearing Officer Jerman concluded that "[c]redible evidence supports a finding that Student is making meaningful progress," and that Southington offered him a FAPE for the 2016-2017 school year. *Id.*

### v. Other Issues

Hearing Officer Jerman found that it was "not necessary to determine whether Student's unilateral private placement was appropriate," because Southington provided him a FAPE through the four relevant academic years. *Id.* Consequently, she also found that "Parents are not

---

[6] June 3, 2016 IEP included academic support two days in a six-day cycle for 46 minutes, continued use of the laptop with related software, e-mails to Mr. Wong weekly with progress updates, and more accommodations in the following general areas: access to special materials, books, equipment; extended time on tests, quizzes, and assessments; organization; environment; behavioral interventions and support; and instructional strategies. *Id.* at 26–27.

entitled to reimbursement for the cost of the unilateral private placement," and "no remedy is due." *Id.*

### C.  Procedural History

The Court assumes familiarity with the underlying background of this case and will only discuss the procedural history relevant to this motion. *See* Ruling and Order on Def.'s Mot. to Dismiss, ECF No. 21 (Jan. 22, 2018); Order, ECF No. 69 (Nov. 20, 2019); Ruling on Mot. to Amend Compl., ECF No. 104 (Apr. 27, 2020).

On May 10, 2018, the Court entered the scheduling order, which set the close of discovery on September 7, 2018. Scheduling Order, ECF No. 25 (May 10, 2018).

On May 15, 2020, the parties filed their motions for judgment on the administrative record, and Plaintiffs were granted requested leave *nunc pro tunc* to file a forty-one page memorandum of law. Def.'s Mot. for J. on Admin. R., ECF No. 107 (May 15, 2020) ("Def.'s Mot."); Mem. of Law in Supp. of Def.'s Mot., ECF No. 107-1 (May 15, 2020) ("Def.'s Mem."); First Mot. for J. and Leave to File 41 Page MOL, ECF No. 108 (May 15, 2020); First Mot. for J., ECF No. 109 (May 15, 2020) ("Pls.' Mot."); Mot. for J. as a Matter of Law, ECF No. 110 (May 15, 2020).

On May 18, 2020, the Court granted *nunc pro tunc* Plaintiffs leave to file a forty-one page memorandum of law. Order, ECF No. 112 (May 18, 2020).

On the same day, Plaintiffs filed a second motion for leave to file a memorandum of law in excess of forty pages, and attached the memorandum to this motion. Pls.' Second Mot. for J. on the Admin. R. and Leave to Submit a Forty-Seven Page Mem. of Law, ECF No. 113 (May 18, 2020); Pls.' Mem. of Law in Supp. of Pls.' Mot., ECF No. 113-1 (May 18, 2020) ("Pls.' Mem."). They stated that their formatting had changed, but otherwise there were no changes between this

and the earlier filed forty-one page memorandum of law supporting their motion for judgment on the pleadings. *Id.* at 1.

On May 19, 2020, the Court granted Plaintiffs' second motion for leave to file a memorandum of law in excess of forty pages and further instructed Plaintiffs how to properly[7] file the new memorandum on the docket. Order, ECF No. 114 (May 19, 2020).

On June 19, 2020, the parties filed their respective responses to each other's motions for judgment on the administrative record. Resp. to Pls.' Mot., ECF No. 117 (June 19, 2020) ("Defs.' Resp."); Pls.' Reply Mem. of Law, ECF No. 118 (June 19, 2020) ("Pls.' Resp.").

On June 24, 2020, the Court granted in part Southington's motion for clarification and denied Plaintiffs' motion for leave to file a reply memorandum of law in excess of ten pages, First Mot. for Clarification, ECF No. 119 (June 23, 2020); First Mot. for Leave to File Reply MOL in Excess of 10 Pages, ECF No. 120 (June 23, 2020). Order, ECF No. 121 (June 24, 2020). The Court stated:

> Although Southington seeks to strike Plaintiffs' 118 response for being in excess of the ten-page limit for reply memoranda, the filing is technically a response to Southington's 107 motion for judgment on the administrative record. The ten-page limit for a reply memorandum thus is inapplicable.
>
> Nevertheless, more than half of Plaintiffs' submission contains no legal argument at all, but instead contains lengthy affidavits from the Plaintiffs themselves, matters which, if relevant to the administrative appeal, already should be contained in the administrative record. *See Genn v. New Haven Bd. of Educ.*, No. 12-cv-00704 (CSH), 2015 WL 1064766, at *3 (D. Conn. Mar. 11, 2015) ("[t]he starting point for determining what additional evidence should be received . . . is the record of the administrative proceeding" (quoting *Town of Burlington v. Dep't of Educ. of Mass.*, 736 F.2d 773, 790 (1st Cir. 1984)). In this case, because Plaintiffs never sought to supplement the record with additional discovery,

---

[7] Plaintiffs did not follow the Court's instruction on how to file this second memorandum on the docket. Accordingly, Plaintiff's pending motion remains ECF No. 109, but the Court cites to ECF No. 113-1 for Plaintiffs' arguments.

any evidence outside of the administrative record is likely improper. *See id.* at \*4 ("The party seeking to supplement the record bears the burden of establishing that the additional evidence is probative of the issues before the court, and must also explain why the evidence was not presented at the administrative level." (citations omitted)); *see also Plainville Bd. of Educ. v. R.N.*, No. 3:09CV241 (RNC), 2009 WL 2059914, at \*1 (D. Conn. July 10, 2009) ("The party moving to submit additional evidence must establish that it is relevant and necessary.").

Accordingly, consistent with this Court's inherent authority to manage its docket to resolve cases efficiently and expediently, *Dietz v. Bouldin*, 136 S. Ct. 1885, 1892 (2016), the Court will strike Plaintiffs' 118 response as nonresponsive to Southington's 107 motion for judgment on the administrative record and an improper attempt to go beyond the administrative record. *See Tucker v. Am. Int'l Grp., Inc.*, 936 F. Supp. 2d 1, 15 (D. Conn. 2013) ("Whether to grant or deny a motion to strike is vested in the trial court's sound discretion." (citing *Hollander v. Am. Cyanamid Co.*, 172 F.3d 192, 198 (2d Cir. 1999); *Impulsive Music v. Pomodoro Grill, Inc.*, No. 08-CV-6293, 2008 WL 4998474, at \*2 (W.D.N.Y. Nov. 19, 2008))).

Plaintiffs shall submit a new response by June 29, 2020. The Court presumes that this refiling will be properly labeled as a response, and not a reply; will only contain the proper arguments already contained in the 108 filing; and will not contain any new arguments. The deadline for any replies remains July 7, 2020, and the Court is not inclined to grant further extensions of time.

To the extent that any party seeks to exceed the ten-page limit for the July 7, 2020 submissions, then any such filing shall be accompanied by an explanation (and legal support) for why any additional pages are necessary.

*Id.*

On July 2, 2020, the Court granted Southington's motion for clarification, Second Mot. for Clarification, ECF No. 122 (July 1, 2020); and granted in part Plaintiffs' motion for reconsideration, First Mot. for Reconsideration of Court's June 24, 2020 Order, ECF No. 123 (July 1, 2020):

The Court will reinstate Plaintiffs' 118 filing, but Southington need not respond to the Wong affidavits. On the ADA and Section 504

14

claims, the only issue appears to be whether the hearing officer properly declined to review them. Southington must file a reply by July 10, 2020.

Plaintiffs will not receive an extension of time to file a reply, because they failed to file a timely response to the Court's June 24, 2020 order, ECF No. 121, despite the Court repeatedly warning the parties that the delays in this case could not continue. See, e.g., ECF No. 88 (Mar. 23, 2020) (granting Plaintiffs an extension of time until May 1, 2020, but not June 3, 2020, to file dispositive motions); ECF No. 104 at 7 (Apr. 27, 2020) ("The Court also notes it is not inclined to grant further extensions of time."); ECF No. 116 (May 20, 2020)("The Court is not inclined to grant further extensions of time."); ECF No. 121 (June 24, 2020) ("The Court is not inclined to grant further extensions of time.").

Order, ECF No. 124 (July 2, 2020).

On July 10, 2020, Southington replied. Reply to Pls.' Resp., ECF No. 125 (July 10, 2020) ("Def.'s Reply").

On August 4, 2020, the Court held a hearing by videoconference on the pending motions. Minute Entry, ECF No. 127 (Aug. 4, 2020).

## II.     STANDARD OF REVIEW

Under the IDEA, "Congress provides federal funds to those states that develop plans to assure 'all children with disabilities the right to a free appropriate public education.'" *Walczak v. Fla. Union Free Sch. Dist.*, 142 F.3d 119, 122 (2d Cir. 1998) (quoting 20 U.S.C. § 1412(1)). A FAPE "must include special education and related services tailored to meet the unique needs of a particular child, and be reasonably calculated to enable the child to receive educational benefits." *Id.* (internal quotation marks and citations omitted). "[A] child remains eligible for a free appropriate education under IDEA until his 22nd birthday." *Lillbask ex rel. Mauclaire v. State of Conn. Dep't of Educ.*, 397 F.3d 77, 86 n.4 (2d Cir. 2005). But, "[u]nder Connecticut law, an individual with a disability is entitled to receive special education until he or she 'is graduated

from high school or reaches age twenty-one, whichever occurs first.'" *A.R. v. Conn. State Bd. of Educ.*, No. 3:16-CV-01197 (CSH), 2020 WL 3086032, at *4 (D. Conn. June 10, 2020) (emphasis omitted) (quoting Conn. Gen. Stat. § 10-76d(b)).

Summary judgment in the IDEA context "involves more than looking into disputed issues of fact; rather, it is a pragmatic procedural mechanism for reviewing administrative decisions." *A.C. ex rel. M.C. v. Bd. of Educ. of The Chappaqua C. Sch. Dist.*, 553 F.3d 165, 171 (2d Cir. 2009) (internal quotation marks omitted). The IDEA left the "primary responsibility for formulating the education to be accorded a handicapped child, and for choosing the educational method most suitable to the child's needs, . . . to state and local educational agencies in cooperation with the parents or guardian of the child." *Bd. of Educ. of Hendrick Hudson C. Sch. Dist. v. Rowley*, 458 U.S. 176, 207 (1982). Consequently, "the role of the federal courts in reviewing state educational decisions under the IDEA is circumscribed" and they must give "due weight" to the administrative proceeding below. *Gagliardo v. Arlington C. Sch. Dist.*, 489 F.3d 105, 112-113 (2d Cir. 2007) (internal quotation marks and citation omitted). So, while a federal court "must engage in an independent review of the administrative record and make a determination based on a preponderance of the evidence," it must also be "mindful that the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." *Id.* at 112–13 (internal quotation marks, citations, and alterations omitted).

"The standard of review requires a more critical appraisal of the agency determination than clear-error review but nevertheless falls well short of complete *de novo* review." *C.F. ex rel. R.F. v. N.Y.C. Dep't of Educ.*, 746 F.3d 68, 77 (2d Cir. 2014) (internal quotation marks and citation omitted). "The deference owed depends on both the quality of the opinion and the

court's institutional competence." *Id.* Deference to the decision reached in the administrative proceeding is particularly warranted where, as here, the Court's decision is based only on the administrative record. *Gagliardo*, 489 F.3d at 113.

"The party appealing [a Hearing Officer's] determination bears the burden of proof in establishing that the [Hearing Officer's] decision is not entitled to deference." *J.C. ex rel. C.C. v. N.Y.C. Dep't of Educ.*, 2015 WL 1499389, at *14 (S.D.N.Y. Mar. 31, 2015), *aff'd sub nom. J.C. v. N.Y.C. Dep't of Educ.*, 643 F. App'x 31 (2d Cir. 2016) (unpublished); *see also Mr. & Mrs. G. as Next Friends of S.G. v. Canton Bd. of Educ.*, No. 3:17-CV-2161 (MPS), 2019 WL 1118094, at *7 (D. Conn. Mar. 11, 2019) (same) (citations omitted). "However, with respect to matters of statutory interpretation, the Court reviews the administrative decision *de novo*." *Doe v. Westport Bd. of Educ.*, No. 3:18-CV-01683 (KAD), 2020 WL 869861, at *2 (D. Conn. Feb. 21, 2020) (citing *Muller on Behalf of Muller v. Comm. on Special Educ. of E. Islip Union Free Sch. Dist.*, 145 F.3d 95, 102 (2d Cir. 1998)).

## III.    DISCUSSION

### A.  Plaintiffs' Standing to Continue this Appeal

As an initial matter, the Court addresses the issue of whether Plaintiffs may continue with this lawsuit, because Student turned eighteen in January 2020, during the pendency of this administrative appeal.

Southington asserts that "no evidence has been submitted to the Court that the Student delegated to his Parents all the legal rights under the IDEA that were transferred to him upon turning eighteen years of age." Def.'s Mem. at 5.

Plaintiffs claim that a "Power of Attorney form signed by [Student] was provided to [Southington's] counsel authorizing [his] parents as his agents[] to continue with this appeal after

reaching the age of majority." Pls.' Mem. at 5.

The IDEA "provides that a state may allow for the transfer of all parental IDEA rights to the child 'when a child with a disability reaches the age of majority under State law.'" *Doe*, 2020 WL 869861, at *2 (quoting 20 U.S.C. § 1415(m)(1)). Connecticut's transfer provision states: "[w]hen a child with a disability reaches the age of eighteen, (1) the board shall provide any notices required by the IDEA . . . to such child and the parents of such child, and (2) all other rights accorded to the parents of such child under the IDEA . . . shall transfer to such child." Conn. Agencies Regs. § 10-76d-12(b). Here, Plaintiffs have submitted a power of attorney form signed by Student, which allows Plaintiffs to act as his agent in all "[c]laims and litigation." Statutory Power of Attorney-Short Form, ECF No. 118 at 41–42 (Jan. 16, 2020).[8]

Accordingly, the Court will allow Plaintiffs to continue with this appeal.

### B. The Relevant Time Period

Under the IDEA, a party may only present a complaint "which sets forth an alleged violation that occurred not more than 2 years before the date the parent or public agency knew or should have known about the alleged action that forms the basis of the complaint[.]" 20 U.S.C. § 1415(b)(6)(B).

Southington contests "the Plaintiffs' right to prosecute IDEA claims for violations that allegedly occurred before May 10, 2014," Def.'s Mem. at 6, because Plaintiffs "knew well before May 10, 2014 that the Defendant had not conducted the evaluations or provided visual therapy services that they claimed were required . . . [and] that the Student's educational program did not include specific accommodations they believed he needed," *id.* at 8.

The Court agrees.

---

[8] The Court notes that the power of attorney form is difficult to read, so it cannot make out the entirety of the text. Because Southington has not objected to this form, however, the Court will accept it.

Hearing Officer Jerman limited her consideration of Plaintiffs' claims to exclude claims predating May 10, 2014. *See* Final Decision at 21 ("Due to the statute of limitations, the scope of this issue is limited to the short time from May 10, 2014 to the end of the school year in June 2014."). To the extent that Plaintiffs seek to appeal the Hearing Officer's decision to not consider their claims predating May 10, 2014,[9] the Court agrees with the Hearing Officer. *See Mr. P v. W. Hartford Bd. of Educ.*, 885 F.3d 735, 747 n.7 (2d Cir. 2018), *cert. denied*, 139 S. Ct. 322 (2018), ("Hearing is limited to complaints about actions that the complainant knew of or should have known of within two years of the date that the hearing is requested." (citing 20 U.S.C. § 1415(f)(3)(C) and Conn. Agencies Regs. 10-76h-4)).

Accordingly, the Court will only consider Plaintiffs' claims beginning May 10, 2014, which are the same claims considered by the Hearing Officer.

### C. Procedural Compliance

The IDEA "provides a variety of procedural safeguards for the parents of disabled children." *Mr. P*, 885 F.3d at 741 (citing *Lillbask*, 397 F.3d at 81–82). "A procedural violation of the IDEA entitles a plaintiff to relief only if it: '(I) impeded the child's right to a [FAPE]; (II) significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of a [FAPE] to the parents' child; or (III) caused a deprivation of educational benefits.'" *Id.* at 748 (quoting 20 U.S.C. § 1415(f)(3)(E)(ii)) (citing *A.M. v. N.Y.C. Dep't of Educ.*, 845 F.3d 523, 535 (2d Cir. 2017)).

"That is, parents must articulate how a procedural violation resulted in the IEP's

---

[9] The Court also notes that Plaintiffs have not briefed the issue, which by itself is a basis for not considering allegations before May 10, 2014. *See, e.g. Froio v. Monroe-Woodbury Central Sch. Dist.*, No. 17-CV-604 (CS), 2020 WL 2731970, at (S.D.N.Y. May 26, 2020) (finding "[t]his type of undeveloped argument [about the ADA and Section 504 claims] unacceptable where a plaintiff is represented by counsel," and noting the court "would be on firm ground were [it] to find this cause of action abandoned based solely on the failure to adequately brief the issue" (citing *Norton v. Sam's Club*, 145 F.3d 114, 117 (2d Cir. 1998)).

substantive inadequacy or affected the decision-making process." *M.W. ex rel. S.W. v. N.Y.C. Dep't of Educ.,* 725 F.3d 131, 139 (2d Cir. 2013). However, "[m]ultiple procedural violations may cumulatively result in the denial of a FAPE even if the violations considered individually do not." *R.E. v. N.Y.C. Dep't of Educ.*, 694 F.3d 167, 190 (2d Cir. 2012).

Plaintiffs argue that Southington committed the following procedural violations: Southington denied parental participation in one or more PPT meetings; Southington "preplanned everything before the PPT meetings" and Plaintiffs "were not allowed to prepare[] for the PPT meeting"; IEPs were not developed during the PPT meetings; recommendations were not incorporated into the IEPs; Plaintiffs "were not allowed to speak during the PPT meetings or ask questions." Pls.' Mem. at 30. Plaintiffs assert that "[n]ot including [them] in all decision making deprived them of the meaningful opportunity to participate in the development of an IEP." *Id.* (citations omitted). Specifically, they argue that excluding them from the January 15, 2015 PPT meeting "was not harmless error." *Id.* (citation omitted).

Southington asserts that Plaintiffs "ignore[] their own testimonial statements regarding participation in the IEP process, such as: asking for new technology devices, which were then added to the Student's IEP . . . consenting to proposed evaluations . . . and bringing agendas and statements to PPTs." Def.'s Resp. at 4. Furthermore, Southington argues that the record shows extensive evidence that "Student's parents were actively involved in the IEP development process." *Id.* Southington contends that Plaintiffs have failed to cite to the administrative record or the IDEA to support their claim that Southington committed a procedural violation of the IDEA. *Id.* at 5–6. Furthermore, Southington argues that it considered all Student's needs and implemented recommendations by external and school professions. Def.'s Mem. at 13–19.

In Plaintiffs' view, they "have satisfied the first prong of the *Rowley* two-part test with respect to whether the Defendants' have complied with IDEA's procedural requirements." Pls.' Resp. at 7.

The Court disagrees.

To ensure parental participation, the IDEA requires

> [a]n opportunity for the parents of a child with a disability to examine all records relating to such child and to participate in meetings with respect to the identification, evaluation, and educational placement of the child, and the provision of a free appropriate public education to such child, and to obtain an independent evaluation of the child.

*Cerra v. Pawling Cent. Sch. Dist.*, 427 F.3d 186, 192 (2d Cir. 2005) (quoting 20 U.S.C. § 1415(b)(1)). The regulations governing parental participation provide that "[e]ach public agency shall take steps to ensure that one or both of the parents of a child with a disability are present at each IEP meeting or are afforded the opportunity to participate[.]" 34 C.F.R. § 300.345(a). The regulations go on to state that "[t]he public agency shall give the parent a copy of the child's IEP at no cost to the parent." 34 C.F.R. § 300.345(f).

Parents possess an unquestionable right to notice and an opportunity to attend and participate in "meetings with respect to the identification, evaluation and educational placement of the child, and the provision of a free appropriate public education to such child." *Cerra*, 427 F.3d at 192 (quoting 20 U.S.C. § 1415(b)(1)). Parental "participation means something more than mere presence; it means being afforded the opportunity to be an equal collaborator, whose views are entitled to as much consideration and weight as those of other members of the team in the formulation and evaluation of their child's education." *W.A. v. Pascarella*, 153 F. Supp. 2d 144, 154 (D. Conn. 2001) (quoting *V.W. v. Favolise*, 131 F.R.D. 654, 659 (D. Conn. 1990)).

In this case, the Hearing Officer found that Plaintiffs attended several PPT meetings

during the relevant period, including on certain dates "at the request of Parents." Final Decision

at 14 ¶ 26. Parents attended the following PPT meetings: January 30, 2014[10], Final Decision at

13 ¶¶ 14–19 (noting that the PPT meeting lasted three and a half hours); September 25, 2014 "at

Parents' request," *id.* at 23; March 27, 2015, *id.* at 16 ¶¶ 35–40 (noting that that facilitated PPT

meeting, wherein Parents were represented by an attorney, lasted three hours); and August 20,

2015, *id.* ¶¶ 46–49.

  Although Parents were not able to attend the PPT meeting on January 16, 2015 for

Student's annual review, that failure is not due to Southington preventing their attendance—the

Hearing Officer found that Plaintiffs notified Southington that same morning they could not

attend due to schedule conflicts. *Id.* at 15 ¶ 33. The Hearing Officer also found that Southington

"made attempts to reschedule," *id.*, as indicated by the March 27, 2015 facilitated PPT, *id.* at 16

¶ 35.

   "The IDEA does not require the parents' presence at [PPT] meetings; rather, it requires

only that the school boards give parents the opportunity to participate in the decision about their

child's educational placement." *Dervishi v. Stamford Bd. of Educ.*, 653 F. App'x 55, 57 (2d Cir.

2016) (summary order) (citing *Cerra*, 427 F.3d at 193). Here, as described above, the record

shows that Southington gave Plaintiffs "ample opportunity to so participate" on numerous

occasions, *id.*, including at least one facilitated PPT where Plaintiffs were represented by an

attorney. *See, e.g.*, *Doe v. East Lyme Bd. of Educ.*, 790 F.3d 440, 449 (2d Cir. 2015) (finding no

procedural violation where parent "fully participated in the June 17, 2009 meeting of the [PPT]

at which the 2009-2010 placement was discussed"); *see also F.L. v. Bd. of Educ. of Great Neck*

---

[10] Although this occurred before May 10, 2014, the IEP established at this PPT meeting applied at the beginning of the relevant time period. *See* Final Decision at 23 ("Student's January 30, 2014 IEP did not stop at the end of the school year but was designed to address his needs for the remainder of sixth grade and the beginning of seventh grade.").

*Union Free Sch. Dist.*, 735 F. App'x 38, 40 (2d Cir. 2018) (summary order) ("There is no basis to find that the District engaged in the kind of 'persistent refusal' to discuss the father's concerns such that the refusal could constitute a 'procedural denial of a FAPE' . . . disagreements do not constitute a procedural denial of a student's FAPE." (citing *T.K. v. N.Y.C. Dep't of Educ.*, 810 F.3d 869, 877 (2d Cir. 2016))).

Accordingly, because Southington fulfilled its duty to ensure Plaintiffs participated in the PPTs, the Court will grant judgment as a matter of law to Southington on this issue.

### D.  Whether Student Received FAPE

The Second Circuit "has emphasized that the substantive adequacy of an IEP is focused on whether an IEP was 'reasonably calculated to enable the child to receive educational benefits' and 'likely to produce progress, not regression.'" *Mr. P*, 885 F.3d at 757 (quoting *A.M.*, 845 F.3d at 541); *see also Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist.*, 137 S. Ct. 988, 1001 (2017) (The IDEA "requires an educational program reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances."). "While the 'IDEA does not itself articulate any specific level of educational benefits that must be provided through an IEP,' 'the door of public education must be opened for a disabled child in a meaningful way. This is not done if an IEP affords the opportunity for only trivial advancement.'" *Id.* (internal quotation marks and citations omitted) (quoting *Walczak*, 142 F.3d at 130).

In addition to procedural claims, Plaintiffs assert that Southington's programming was insufficient, and thus substantively violated the IDEA. The Court addresses each of Plaintiff's allegations below by academic year.

###### i.  2013-2014

Plaintiffs argue that Southington did not incorporate all the recommendations from outside evaluators into Student's IEP to address "areas of need" in "occupational therapy, vision therapy, additional direct academic instruction" and more. Pls.' Mem. at 33–34. Further, they assert that Southington "did not provide any IEP progress reports for consideration by the Hearing Officer for 2013-2014 school year after May 10, 2014." *Id.* at 34.

Southington argues the "IEP included individualized specialized instruction, related services from an occupational therapist, significant accommodations for reading, written expression and work completion, supported study, consultation among the Student's providers, and classroom accommodations that ensured he could receive educational benefit." Def.'s Mem. at 21. Southington emphasizes that the sixth grade IEP was also based on "multiple evaluations, including three additional evaluations requested by the Plaintiffs, curricular based assessments and classroom performance." *Id.* (citations to record omitted). Southington further asserts that the June 17, 2014 IEP progress report, which covered the contested time period, and was a basis for the Hearing Officer's decision. Def.'s Resp. at 8.

The Hearing Officer found that "Student's IEP for the period May 14, 2014 to the end of his sixth-grade year included appropriate recommendations and accommodations tailed to [his] needs and was implemented in an inclusion setting." Final Decision at 22.

The Court agrees.

The record supports the finding that the IEP was individually tailored to Student and reasonably tailored to allow him to progress. Plaintiffs have pointed to no evidence that Student was regressing, and his grades at the end of sixth grade "ranged from B+ to A+." Final Decision at 23. "Grades are an 'important indication' of progress." *Mr. & Mrs. G.*, 2019 WL 1118094, at

*15 (quoting *Mr. P.*, 885 F.3d at 758). The Second Circuit has "expressly held that when a learning-disabled child is in a mainstream class, 'the attainment of passing grades and regular advancement from grade to grade' will generally constitute evidence of satisfactory progress." *Cerra*, 427 F.3d at 196 (quoting *Walczak*, 142 F.3d at 130).

Furthermore, contradicting Plaintiffs' allegations here, the record indicates that the PPT's denial of vision and occupational therapy was well-supported. In fact, despite support from "the Federal Register definition of Visual Impairment and . . . the BESB Consultant's report and recommendations," the IEP nevertheless "provided services and accommodations to meet his vision needs, including assistive technology and [occupational therapy] services." Final Decision at 13; *see also* Occupational Therapy Evaluation, ECF No. 92-3 at 32 (May 30, 2013) ("Based on the results of the above evaluation and [Student]'s demonstration of skills within his classroom, he does not qualify for direct Occupational Therapy services at this time."). The Hearing Officer specifically found that the PPT took Student's "[o]ptometrist's report into consideration." Final Decision at 13; *see also id.* ("The BESB Consultant told Special Education Coordinator 1 that Student was not Visually Impaired.").

The Hearing Officer's decision regarding substantive adequacy is entitled to deference and well-supported by the record.

Accordingly, the Court finds that a preponderance of the evidence indicates that Student's sixth-grade IEP was reasonably calculated to produce progress in light of his circumstances and thus is substantively adequate. The Student received a FAPE for the 2013-14 school year.

### ii.  2014-2015

Plaintiffs argue that Southington "did not provide any IEP progress reports for consideration by the Hearing Officer . . . for the 2014-15 school year after November 7, 2014." Pls.' Mem. at 34. In their view, the Hearing Officer improperly concluded Student received a FAPE "without the benefit of written IEP progress reports." *Id.* at 35.

Southington emphasizes the specific strategies in Student's IEP to address his identified needs, and that Student made "significant progress," so much so that "the neuropsychologist concluded he no longer met the criteria for a learning disorder in math." Def.'s Mem. at 23–24. In fact, Southington notes that while in seventh grade, Student "scored at the post-high school level on the vocabulary and comprehension elements of one reading evaluation, and well above average on a second reading evaluation, . . . [and] achieved much higher scores on the mid-year math evaluation than he achieved on the fall evaluation." *Id.* at 25. Southington also points to four IEP progress reports in the record that demonstrate how "Student benefitted from the specialized instruction, related services and school accommodations." Def.'s Resp. at 8.

The Hearing Officer found that "[d]uring the 2014-15 school year, Student's IEPs included appropriate recommendations and accommodations tailored to Student's needs and were implement in an inclusion setting." Final Decision at 25.

The Court agrees.

The record supports the finding that the IEP was individually tailored to Student and reasonably tailored to allow him to progress. Again, Plaintiffs have pointed to no evidence that Student was regressing, and his grades at the end of seventh grade "ranged from B- to A+," even with enrollment in a more rigorous math curriculum than regular seventh grade math. Final Decision at 25. The record also shows Student's progress in terms of standardized testing.

*Compare* Conn. State Dep't of Educ. Test Results, ECF No. 90-6 at 9 (Spring 2015) (indicating Student's seventh-grade scores in literacy and mathematics were both at "Level 4: Exceeds" expected achievement level, while the school and district average were both at the lower end of "Level 3: Meets" expected achievement level), *with* Conn. Mastery Test Student Report, ECF No. 92-5 at 35 (March 2013) (indicating that while Student's fifth grade scores in mathematics, science, reading, and writing met the goal ranges, none were in the advanced range).

As to Plaintiffs' allegations that Southington did not provide written progress reports for the Hearing Officer's consideration after November 7, 2014, the Court notes that the record includes the following progress reports: Progress Report for IEP Goals and Objectives 2013-2014, ECF No. 92-12 at 2–6 (June 17, 2014) (indicating mostly satisfactory progress); Progress Report for IEP Goals and Objectives 2014-2015, ECF No. 92-12 at 7–11 (Nov. 7, 2014) (indicating mostly satisfactory progress); Progress Report for IEP Goals and Objectives 2014-2015, ECF No. 90-5 at 39–41 (Feb. 13, 2015) (indicating satisfactory progress and "[m]astered"); Progress Report for IEP Goals and Objectives 2014-2015, ECF No. 90-6 at 2–8, 12–17 (Apr. 28, 2015) (indicating mostly satisfactory progress, due to "new goals and objectives [] just developed in April 2015").

The Hearing Officer's decision regarding substantive adequacy is entitled to deference and well-supported by the record.

Accordingly, the Court finds that a preponderance of the evidence indicates that Student's seventh-grade IEP was reasonably calculated to produce progress in light of his circumstances and is thus substantively adequate. The Student received a FAPE for the 2014-15 school year

### iii. 2015-2016

Plaintiffs argue that the "adverse rulings against [them] for the 2015-16 . . . school year[] [was] based primarily upon the Hearing Officer's assessment of the Defendants' witnesses' credibility when presenting their case in chief." Pls.' Mem. at 35. They assert that "there was insufficient substantial evidence on the record to support the Hearing Officer's conclusion that FAPE was provided throughout the school years at issue." *Id.*

Southington argues that the 2015-2016 IEP "included similar supports and services" as before, and were "based on the Student's present levels of performance and included updated goals and objectives and classroom accommodations reflective of the 2015 neuropsychological evaluation report." Def.'s Mem. at 28–29. Southington also asserts that because Plaintiffs indicated at the August 20, 2015 PPT meeting that they had already decided to unilaterally place Student at Southington Catholic, Plaintiffs "offer[] no legitimate argument that they considered the August 2015, IEP revisions." Def.'s Reply at 5–6.

The Hearing Officer first determined that the "[t]he only concern Parents raised at the [August 20, 2015] PPT meeting was to request vision therapy" before reading a prepared statement indicating their intent to unilaterally place Student. Final Decision at 26. The Hearing Officer then concluded that the "proposed 2015-16 IEP included appropriate recommendations and accommodations tailored to Student's needs and were proposed to be implemented in an inclusion setting." *Id.*

The Court agrees.

As Plaintiffs concede, the "assessment of a witness' credibility is within the province of the Hearing Officer," Pls.' Mem. at 35, and they have raised no other specific arguments as to why the Hearing Officer's decision was unsupported by the evidence.

To the extent that Plaintiffs argue that the denial of vision therapy equated to a substantive denial of a FAPE, the Court notes that they "provided no medical records or diagnosis indicating that Student met the definition of Visual Impairment." Final Decision at 25. Consequently, by failing to demonstrate record evidence that Student had a visual impairment requiring specific accommodations not already offered, Plaintiffs have not met their burden to demonstrate that the Hearing Officer erred in finding Southington provided a FAPE. *See Bryant v. N.Y. State Educ. Dep't*, 692 F.3d 202, 215 (2d Cir. 2012) ("The IDEA 'guarantees' only that students with disabilities are provided an 'appropriate education, not one that provides everything that might be thought desirable by loving parents.'" (internal quotation marks omitted) (quoting *Walczak*, 142 F.3d at 132)).

The Hearing Officer's decision regarding substantive adequacy is entitled to deference and well-supported by the record.

Accordingly, the Court finds that a preponderance of the evidence indicates that Student's proposed eighth-grade IEP was reasonably calculated to produce progress in light of his circumstances and is thus substantively adequate. The Student received a FAPE for the 2015-16 school year.

### iv.  2016-2017

Plaintiffs repeat the same arguments from earlier school years, and take issue with the Hearing Officer's credibility assessments of Southington's witnesses. Pls.' Mem. at 35. Plaintiffs also assert, without specifying which school year, that Southington "ha[s] not differentiated between the numerous evaluation private reports provided by the Plaintiffs' [sic] for review during PPT meetings that supported the need for increased services, including vision therapy, as recommended by [certain doctors], presented during PPT meetings and Defendants' refusal of

those requests for additional supports, services, and/or vision therapy." Pls.' Resp. at 8–9.

Southington argues in detail how the proposed 2016-2017 IEP addressed Student's needs, Def.'s Mem. at 32–34, and notes that "no witnesses for the Plaintiffs identified a specific problem in the IEP other than the parents' concerns about the lack of visual therapy services and no visual impairment label, which the Hearing Officer determined was not required for the Student to receive a FAPE." *Id.* at 33.

The Hearing Officer found that the proposed 2016-2017 IEP "addresse[d] Student's visual and executive functioning needs," Final Decision at 27, and that "Student continues to progress which is evident by his scores," *id.* at 28. The Hearing Officer concluded that Southington "offered Student FAPE for the 2016-17 school year." *Id.*

The Court agrees.

As to Plaintiffs' argument that Southington did not "differentiate" between the various evaluations, the Court finds a lack of record support for their claims. The Hearing Officer made specific findings regarding evaluation reports submitted by an independent psychologist in May 2013, Final Decision at 12 ¶ 8; Student's optometrist in July 2013, *id.* at 12 ¶ 11; and a neuropsychologist on May 4, 2015, *id.* at 16 ¶ 42. The Hearing Officer also found that the PPT considered and incorporated these reports while developing Student's IEP through the years. *See, e.g.*, *id.* at 17 ¶¶ 46 – 47 (finding that the August 20, 2015 PPT incorporated the results of the neuropsychological evaluation). Plainly, there is no objective evidence in the record that supports Plaintiffs' contentions. *See Gagliardo*, 489 F.3d at 113 (noting that "in order for the district court to conduct an 'independent' review of the sufficiency of an IEP under the IDEA that does not 'impermissibly meddl[e] in state educational methodology,' it must examine the record for 'objective evidence' that indicates 'whether the child is likely to make progress or regress under

the proposed plan.'" (internal citations omitted)).

To the extent Plaintiffs raise the same arguments as before, the Court dismisses them for the same reasons as before, namely, that the record supports a finding that Student was making meaningful progress with the supports from his IEP.

The Hearing Officer's decision regarding substantive adequacy is entitled to deference and well-supported by the record.

Accordingly, the Court finds that a preponderance of the evidence indicates that Student's proposed ninth-grade IEP was reasonably calculated to produce progress in light of his circumstances and is thus substantively adequate. Student received a FAPE for the 2016-17 school year, as he did for all four school years at issue.

### E. Entitlement to Reimbursement for Unilateral Placement and Balance of Equities

Plaintiffs assert: "If the Court finds that the school district's IEP has denied a student FAPE, then the Court can ascertain whether or not the private school selected by the Parents can meet the student's needs." Pls.' Resp. at 15. Plaintiffs seek reimbursement of their "costs incurred for the Southington Catholic School based upon the existing administrative record," or a remand "for a hearing on the issue of whether or not the [unilateral placement] was appropriate for Student's needs." Pls.' Mem. at 38.

Southington argues that "even if there were a need to address the parochial school placement, the record shows the Plaintiffs are not entitled to tuition reimbursement because the school was not appropriate to his needs." Def.'s Mem. at 29–30. Southington asserts that "Plaintiffs presented no evidence to support their claim that purported smaller general education classes at the parochial school and the reported attitude and leadership of the school's administrators benefitted the Student," nor did they "present any evidence the parochial school

program offered the Student services and accommodations to address his individual needs." *Id.* at 30. Furthermore, Southington notes "Plaintiffs failed to present any evidence the school provided the individual visual therapy services they claim the Student needed at Defendant's middle school." *Id.*

Hearing Officer Jerman found that it was "not necessary to determine whether Student's unilateral private placement was appropriate," because Southington provided him a FAPE through the four relevant academic years. Final Decision at 28. Consequently, she also found that "Parents are not entitled to reimbursement for the cost of the unilateral private placement," and "no remedy is due." *Id.*

The Court agrees.

"[R]eimbursement is available where . . . the agency failed to make a free public education available to the child." *Frank G. v. Bd. of Educ. of Hyde Park*, 459 F.3d 356, 370 (2d Cir. 2006). "A unilateral private placement is only appropriate if it provides 'education instruction specifically designed to meet the *unique* needs of a handicapped child.'" *Gagliardo*, 489 F.3d at 115 (2d Cir. 2007) (emphasis omitted) (quoting *Frank G.*, 459 F.3d at 365); *see also N.B. v. N.Y.C. Dep't of Educ.*, 711 F. App'x 29, 32–34 (2d Cir. 2017) (summary order) (holding that parents of a child diagnosed with autism were not entitled to reimbursement under the IDEA for tuition at a private school that specialized in educating students with autism); *see also Gagliardo*, 489 F.3d at 114 (finding that the district court's grounds for disturbing the hearing officer's "reasoned conclusion [as to whether the unilateral placement was appropriate] are not supported by the record"). In light of the Court's decision that Southington provided Student with a FAPE, the Court need not address Plaintiffs' claim for tuition reimbursement, nor does it need to address whether the balance of equities

32

Accordingly, the Court will affirm the Hearing Officer's decision not to award tuition reimbursement.

### F.  ADA and Section 504 Claims

"Because the ADA and Section 504 impose 'nearly identical' requirements, courts 'consider the merits of these claims together.'" *B.C. v. Mount Vernon City Sch. Dist.*, No. 11 CV 1411 VB, 2014 WL 4468082, at *6 (S.D.N.Y. Aug. 28, 2014), *aff'd sub nom. B.C. v. Mount Vernon Sch. Dist.*, 837 F.3d 152 (2d Cir. 2016), and *aff'd sub nom. B.C. v. Mount Vernon Sch. Dist.*, 660 F. App'x 93 (2d Cir. 2016), (quoting *Disabled in Action v. N.Y.C. Bd. of Elections,* 752 F.3d 189, 196 (2d Cir. 2014)).  "The same burden-shifting framework for Title VII cases applies to retaliation cases under Section 504 and the ADA." *Genn v. New Haven Bd. of Educ.*, 219 F. Supp. 3d 296, 322 (D. Conn. Nov. 30, 2016) (citing *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002)).

In addition to their IDEA claims, Plaintiffs also challenge the Hearing Officer's dismissal of their Section 504 and ADA claims for lack of jurisdiction, and assert that Southington discriminated and retaliated against Student based on his disability, race, and national origin, and against Plaintiffs' advocacy for their son. Pls.' Mem. at 39–46. Specifically, Plaintiffs allege that Plaintiffs, as parents of Student, who has a disability, "associated with him and advocated for rights secured by the IDEA and other laws to ensure that his IDEA special education needs were addressed by [Southington]." *Id.* at 39.

Because Plaintiffs "engaged in the protected activity of conveying their concerns for enhancing [Student]'s education," they contend "they should be protected from retaliation and reprisal by [Southington] as set forth in their September 28,[]2015 letter[.]" *Id.* at 40. As examples of retaliation, Plaintiffs assert that Southington limited their efforts to communicate

with school staff to only PPT meetings, and took adverse action against their son by "removing him from the National Honor Society following their zealous advocacy to contest a December 5,[]2014 incident whereby he was disciplined . . . and suspended." *Id.* at 40, 44. Plaintiffs assert that Student was "cleared by the IT analyst of any wrongdoing." *Id.* at 45. In addition to the previously delineated allegations related to the denial of a FAPE, they also allege that Southington failed to reimburse them for "door to door transportation and tuition costs," and failed to provide reasonable accommodations to Student. *Id.*at 40–41.

In their view, these "claims are pending and involve contested issues of fact that cannot be summarily resolved through the Motion for Judgment on the Administrative Record." *Id.* at 42. Because the Hearing Officer "never adjudicated" these claims, Plaintiffs seek a "separate Scheduling Order" for the Court to "permit discovery on these outstanding claims." *Id.* at 46.

Southington responds that Plaintiffs' "Section 504/ADA [d]iscrimination [c]laims are [b]aseless" because Plaintiffs "failed to prove during the hearing that their and/or the Student's purported exclusion from participation in the Defendant's services, programs or activities was the result of the Defendant's intentional discrimination." Def.'s Mem. at 34–35. Southington asserts that "Plaintiffs have failed to demonstrate [Southington] 'was, at the minimum, deliberately indifferent to a strong likelihood that [Student's] federal rights would be violated.'" *Id.* at 35 (citation omitted). Southington argues that the "preponderant evidence [] proves the Student's IEPs . . . included many reasonable accommodations." *Id.* at 36.

As for Plaintiffs' retaliation claims, Southington argues that those claims also fail because it "did not take adverse action against the Plaintiffs or the Student, and there is no causal link between any of [Southington's] actions and [Plaintiffs']advocacy." *Id.* at 37. Even if Plaintiffs could establish a prima facie retaliation claim, Southington argues that it "had

legitimate non-discriminatory reasons for its actions." *Id.*

The Court agrees.

Under Connecticut law, an IDEA Hearing Officer's jurisdiction is limited to IDEA claims. *See generally* Conn. Gen. Stat. § 10-76h(d) (describing the "hearing officer or board['s]" authority). IDEA hearing officers may only consider Section 504/ADA issues "provided that a determination of the issue is necessary to ensure that the substantive and procedural rights of the particular child or parent or guardian who initiated due process are being complied with." *Doe*, 2020 WL 869861, at *6 (internal citation and quotation marks omitted). In this case, the Court previously held that "[o]n the ADA and Section 504 claims, the only issue appears to be whether the hearing officer properly declined to review them." Order, ECF No. 124 (July 2, 2020). The Court also held that "because Plaintiffs never sought to supplement the record with additional discovery, any evidence outside of the administrative record is likely improper." Order, ECF No. 121 (June 24, 2020); *see also* Ruling on Mot. to Amend the Compl. at 6 ("Given the long delays in the prosecution of this case and its impact on the case's ultimate resolution, the Court will not grant Plaintiffs leave to amend their Complaint at this time.").

As a result, to the extent that Plaintiffs challenge the Hearing Officer's dismissal of their ADA/Section 504 claims, the Court dismisses that claim and affirms the Hearing Officer's decision to do so. Because Plaintiffs have exhausted their IDEA administrative remedies, the Court also will address the merits of their ADA/Section 504 claims.

Here, although Plaintiffs claim here[11] "[t]here is no administrative record for the Court to review" regarding their ADA and Section 504 claims, Pls.' Mem. at 42, the Court finds that the

---

[11] The Court notes that in a later filing, Plaintiffs claim that the administrative record contains "sufficient factual information" for the Court to find there was enough information to establish that Plaintiffs' rights under the ADA and Section 504 were violated. Pls.' Mem. of Law in Supp. of Their Mot. for Reconsideration, ECF No. 123-1 at 6 (July 1, 2020).

record refutes their claims, which are another iteration of their IDEA claims asserting that

Southington denied Student a FAPE. *See, e.g. C.L. v. Scarsdale Union Free Sch. Dist.,* No. 10-

CV-4315(CS), 2012 WL 983371, at *16 (S.D.N.Y. Mar. 22, 2012), *rev'd on other grounds,* 744

F.3d 826, (finding that "at its core, Plaintiffs' Rehabilitation Act claims is simply a repackaging

of their IDEA claim").

    And here, the Court has already found that the record supports the Hearing Officer's

decision that Southington complied with the IDEA both procedurally and substantively. *See B.C.

v. Mount Vernon Sch. Dist.*, 837 F.3d 152, 161 (2d Cir. 2016) ("Those seeking relief pursuant to

ADA or Section 504 must come forward with 'additional evidence'—beyond simply their

eligibility for IDEA coverage—showing their eligibility for the remedies afforded by the ADA

and Section 504." (quoting *Rodriguez v. Vill. Green Realty, Inc.*, 788 F.3d 31, 45 (2d Cir. 2015)).

    To establish a claim under the ADA or Section 504, a plaintiff must prove, among other

things, "he was denied the opportunity to participate in or benefit from the defendant's services,

programs, or activities, or was otherwise discriminated against by the defendant because of his

disability." *McElwee v. Cnty. of Orange,* 700 F.3d 635, 640 (2d Cir.2013). Plaintiffs must show

that they were "otherwise discriminated against" on the basis of disability under one of three

theories: disparate treatment, disparate impact, or failure to make a reasonable

accommodation. *See Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown,* 294 F.3d

35, 48 (2d Cir. 2002). "Acts of discrimination against a disabled student must be intentional to

support a claim arising under the Rehabilitation Act, and courts in the Second Circuit regularly

require conduct that is akin to 'bad faith or gross misjudgment.'" *J.C. ex rel. C. v. New Fairfield

Bd. of Educ.*, No. 3:08-cv-1591(VLB), 2011 WL 1322563, at *21 (D. Conn. Mar. 31, 2011)

(quoting *Brennan v. Regional Sch. Dist.*, 531 F. Supp. 2d 245 n.37 (D. Conn. 2008)); *see also*

*C.L. v. Scarsdale Union Free Sch. Dist.*, 744 F.3d 826, 841 (2d Cir. 2014) ("[A] Section 504

claim [based on the denial of a FAPE] . . . requires proof of bad faith or gross misjudgment."

(citations omitted)).

Plaintiffs have proceeded on the theory that Southington failed to make a reasonable

accommodation. *See* Compl. ¶ 8, ECF No. 1-1 (Oct. 14, 2016) ("Student was denied 504

Accommodations"); Pls.' Mem. at 41 ("[Southington], as a federal fund recipient, w[as]

obligated to provide reasonable accommodations to [Student]'s physical and mental disability to

ensure that their programs, policies, services and/or activities were accessible and useable as

required by the Rehabilitation Act." (emphasis omitted)). Assuming that Student has a qualifying

disability,[12] "[a]t issue then is whether Student 'was denied the opportunity to participate in or

benefit from [Southington's] services, programs, or activities, or was otherwise discriminated

against by [Southington], by reason of [his] disability.'" *Genn*, 219 F. Supp. 3d at 322 (quoting

*Harris v. Mills,* 572 F.3d 66, 74 (2d Cir. 2009)).

To the extent that Plaintiffs base the allegation of failure to make a reasonable

accommodation for Student on the denial of a FAPE, those claims must fail, because the Court

has already found that Southington provided the Student a FAPE. Furthermore, no reasonable

jury could conclude that Southington violated Student's rights under either the ADA or Section

504, because the record lacks sufficient evidence for a reasonable jury to conclude that

Southington acted in bad faith or gross misjudgment to intentionally discriminate against

Student. And, since they filed their Complaint in late 2016, Plaintiffs have never sought to

---

[12] "[T]he ADA and IDEA set forth distinct legal standards in their definitions of 'disability,' such that an individual will not qualify for the ADA's protections simply by virtue of his or her disabled status under the IDEA." *B.C.*, 837 F.3d at 160. "Section 504 operates similarly to the ADA, prohibiting discrimination on the basis of disability in programs receiving federal financial support." *Id.* at 161 n.9. Consequently, "an IDEA disability is not equivalent to a disability as cognizable under the ADA and Section 504," and Plaintiffs "cannot rely solely on 'receipt of special education' to establish an ADA or Section 504 disability." *Id.* at 161 (citation omitted).

supplement the record with additional discovery.[13]

As previously discussed, the record demonstrates that Student's IEP provided reasonable accommodations to ensure that Student had the same access to the benefits of a public education as all other students. The record shows Southington acted diligently and thoughtfully in their consideration of Student. "[S]omething more than a mere violation of the IDEA is necessary in order to show a violation of Section 504 in the context of educating children with disabilities," *S.W. by J.W. v. Warren*, 528 F. Supp. 2d 282, 289 (S.D.N.Y. 2007), and here, Plaintiffs have not even established an IDEA violation. *See also C.L.*, 2012 WL 983371, at *16 ("Even if Defendant violated the IDEA by failing to provide [the student] with a FAPE, without actual evidence of bad faith or gross misjudgment, this failure simply does not translate into a violation of the Rehabilitation Act."). Consequently, the Court will dismiss Plaintiffs' ADA and Section 504 claims.

As to Plaintiffs' claims of discrimination on the basis of Student's race or national origin as an individual of Asian descent, Plaintiffs have not met their burden. Under the Title VII framework, as already noted, Plaintiffs "must first satisfy the minimal burden of making out a prima facie case of discrimination; the burden then shifts to the defendant to produce a legitimate, nondiscriminatory reason for its actions; and the final burden rests with the plaintiff to prove that . . . the defendant intentionally discriminated against the plaintiff—here, on the basis of race." *Gant ex rel. Gant v. Wallingford Bd. of Educ.*, 195 F.3d 134, 146 (2d Cir. 1999) (internal citations omitted).  In this case, Plaintiffs have pointed to no examples of racial or

---

[13]At oral argument, when asked what additional discovery would demonstrate, Plaintiffs' counsel answered only that it would reveal more information about Plaintiffs' subjective beliefs as to their asserted claims. This representation fell short of even the "plausible entitlement" to relief required at the pleading stage to maintain a lawsuit. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007))**.**

national origin discrimination in the record.[14] *See, e.g.*, *Gant*, 195 F.3d at 149–50 ("As a general matter, race discrimination cannot reasonably be inferred merely from a finding that a decision amply supported by academic considerations and falling within the broad discretion of school officials affected a minority student and is open to second-guessing."); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 681 (2009) (finding that "conclusory" allegations for a constitutional discrimination claim are "not entitled to be assumed true" (citing *Twombly*, 550 U.S. at 554–55). Consequently, the Court will also dismiss any claims based on racial or national origin discrimination.

To establish a retaliation claim under the ADA or Section 504, Plaintiffs must show "(1) [they] w[ere] engaged in a [protected] activity, (2) the [public entity] was aware of that activity, (3) an [] action adverse to [Plaintiffs] occurred, and (4) there existed a causal connection between the protected activity and the adverse [] action." *Sarno v. Douglas Elliman–Gibbons & Ives, Inc.*, 183 F.3d 155, 159 (2d Cir. 1999). "A causal connection in retaliation claims can be shown either (1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Natofsky v. City of N.Y.*, 921 F.3d 337,

---

[14] Based on Plaintiffs' history of zealous advocacy for themselves and Student on so many issues regarding the Student's educational experience in Southington, the absence of record evidence of complaints to Southington officials about the occurrence of racial or national origin discrimination is notable.

　　In any event, to the extent that Plaintiffs now argue that Southington was deliberately indifferent to Student's harassment—which they have not previously pled or argued—this claim also must fail on this record. "To succeed on a deliberate indifference claim, a plaintiff must prove that (1) the child in question was in fact harassed by other students based on race, (2) the defendant had actual knowledge of the harassment, and (3) the defendant's response was 'clearly unreasonable in light of the known circumstances.'" *Karlen v. Landon*, 503 F. App'x 44, 46 (2d Cir. 2012) (internal quotation marks omitted) (quoting *Gant ex rel. Gant v. Wallingford Bd. of Educ.*, 195 F.3d 134, 140–141 & n. 6 (2d Cir.1999)) (citing *DiStiso v. Cook*, 691 F.3d 226, 241 (2d Cir. 2012)). On this record, however, the Hearing Officer specifically found that "[a]dministrators working directly with Student and his educational program did not witness any bullying, harassment, or discrimination or receive complaints of such." Final Decision at 21.

353 (2d Cir. 2019) (internal quotations omitted) (citing *Littlejohn v. City of N.Y.*, 795 F.3d 297,

319 (2d Cir. 2015); *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000)).

"In adjudicating retaliation claims, courts follow the familiar burden-shifting approach of

*McDonnell Douglas Corp.*" *v. Green*, 411 U.S. 792 (1973). *Kaytor v. Electric Boat Corp.*, 609

F.3d 537, 552 (2d Cir. 2010). Under this framework, "[a] plaintiff must establish a prima facie

case; the [entity] must offer through the introduction of admissible evidence a legitimate non-

discriminatory reason for the discharge; and the plaintiff must then produce evidence and carry

the burden of persuasion that the proffered reason is a pretext." *See McBride*, 583 F.3d at 96

(citing *Sista v. CDC Ixix N.A., Inc.*, 445 F.3d 161, 169 (2d Cir. 2006)). "The proper question for

a retaliation claim is whether the alleged adverse action to which the plaintiff was subjected

could well have dissuaded a reasonable [person] in his position from complaining of unlawful

discrimination." *Davis-Garrett v. Urban Outfitters, Inc.*, 921 F.3d 30, 44 (2d Cir. 2019) (citing

*Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006)). Finally, "Title VII

retaliation claims must be proved according to traditional principles of but-for causation." *Univ.*

*of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2534 (2013).

The only new allegations applicable to Plaintiffs' retaliation claims are based on (1)

Student's removal from the National Junior Honor Society following an incident that resulted in

his suspension and (2) Southington's alleged interference with Plaintiffs' e-mail

communications. Even if Plaintiffs could establish a prima facie case of retaliation, the Court

finds that Southington had legitimate nondiscriminatory reasons for both these allegations, which

warrant the dismissal of Plaintiffs' retaliation claims as well, because similar to their failure to

establish bad faith on Southington's part, Plaintiffs cannot meet their ultimate burden of showing

discrimination as the but for cause of any alleged action.

40

First, as to the incident that resulted in Student's suspension, the Hearing Officer did not find that Southington's actions adversely impacted Student's education. *See, e.g.*, Final Decision at 16–17 ¶ 44 (noting Student's "outstanding progress" in seventh grade, during which he was suspended for three days). Furthermore, the legitimate nondiscriminatory reason for Student's removal from National Junior Honor Society was based on his suspension, which violated the group's code of conduct. Although Parents emphasize that "no e-mails from [Student's laptop] containing confidential educational records were ever disseminated to any third party," the Student was not cleared of "any wrongdoing," as Plaintiffs allege. *See* Pls.' Mem. at 44–45. Instead, it is undisputed that, on December 5, 2014, the Student "removed a flash-drive from a teacher's computer that was on her desk," and that the flash-drive contained confidential information about other students' disability and IEPs. *See* Letter from Assistant Principal, ECF No. 90-5 at 29 (Dec. 9, 2014) (indicating that "[u]nder the Family Educational Rights and Privacy Act (FERPA) personally identifiable information such as this regarding your child is to remain confidential unless it is specifically released by you"). The letter sent to impacted parents and students also indicated that "[i]mmediate disciplinary action was taken." *Id.*

While there is record evidence of this theft, and the Student's commission of the theft, at the motion hearing, counsel for Plaintiffs emphasized the delay between the incident on December 9, 2014, and Student's removal from the National Junior Honor Society on January 15, 2015. *See* Letter from NJHS Adviser, ECF No. 90-5 at 32. Despite this argument of temporal proximity[15] as the causal connection between these two instances, "[t]emporal proximity alone is insufficient to defeat summary judgment at the pretext stage." *Zann Kwan v. Andalex Group*

---

[15] The only (and undisputed) record evidence of the cause of this delay in time is the school holiday break. *See* E-mail Between J. Wong and S. Madancy, ECF No. 90-5 at 27 (Dec. 22, 2014) (noting that Southington school administrator "will be unable to provide any further requested documentation prior to the holiday break").

*LLC*, 737 F.3d 834, 847 (2d Cir. 2013); *accord Sanderson v. N.Y. State Elec. & Gas Corp.*, 560 F. App'x 88, 94 (2d Cir. 2014). A plaintiff would need other evidence, in addition to temporal proximity, "such as inconsistent . . .  explanations, to defeat summary judgment." *Id.* (collecting cases). There are "no inconsistent explanations" in this record with respect to the Student's removal from the National Junior Honor Society. There is only one explanation in this record: the Student committed "a flagrant violation of school rules or the law." *Id.* Consequently, Plaintiffs cannot assert a plausible entitlement to relief on their retaliation claim based on Student's removal from the National Junior Honor Society. *See Iqbal*, 556 U.S. at 678 ("conclusory statements" are insufficient); *see also id.* at 678 ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." (citing *Twombly*, 550 U.S. at 556).

Second, as to Southington's alleged limitation of Plaintiffs' communications with school staff, there is little record evidence to support any such limitation, and no record evidence probative of any retaliation.  The record indicates that the school staff consistently responded to the Plaintiffs. *See, e.g.*, Letter from Superintendent of Schools to Pls., ECF No. 90-5 at 33–34 (Jan. 8, 2015) (outlining for Plaintiffs "the continued mutual expectations and procedural steps for facilitating timely and appropriate responses and services to meet the needs" of Student because of a new process instituted in response to their "hostile" messages whereby "building administrators take time each day to review all email messages" sent by Plaintiffs to staff members "before those respective staff members receive them"); *see also* Admin. Hrg. Tr., ECF No. 84-1 at 209 (July 18, 2016) (Mr. Wong answering that he was "able to communicate with school staff").

At the motion hearing, counsel for Plaintiffs argued that Southington affirmatively blocked e-mails from the Plaintiffs. The record indicates, however, that Anthony Tranquillo, Southington's technology analyst, testified that Southington's off-site server independently marked one of Plaintiffs' e-mail addresses as spam.[16] In any event, on this record, consistent with the Hearing Officer's findings, the Plaintiffs were not prevented from communicating with Southington. *See also* Final Decision at 20 (finding that "Parents were able to communicate with [Southington] administrators and teachers via other personal email addresses." (citing Plaintiffs' testimony)).

Plaintiffs thus have no viable retaliation claims. Ultimately, Plaintiffs failure to establish the denial of a FAPE warrants the dismissal of their related ADA and Section 504 claims as well.

Accordingly, the Court will dismiss Plaintiffs' claims for discrimination and retaliation under the ADA and Section 504.

## IV.   CONCLUSION

For the reasons explained above, the Court **DENIES** Plaintiffs' motion for judgment on the administrative record and **GRANTS** Southington's motion for judgment on the administrative record.

The Clerk of Court is respectfully directed to enter judgment and close this case.

**SO ORDERED** at Bridgeport, Connecticut, this 7th day of August, 2020.

  /s/ Victor A. Bolden
Victor A. Bolden
United States District Judge

---

[16] At one of the hearing days, July 26, 2016, Mr. Tranquillo testified: "our email servers are run by a company called Digital Back Office. And so it's offsite and it's not run by us. Servers are hosted by someone else. I spoke to someone at the Digital Back Office and [the e-mail address in question] was blocked for sending spam." Admin. Hrg. Tr., ECF No. 84-2 at 8:5–9 (July 26, 2016). He also testified that he was "just made aware of this yesterday," *id.* at 9:13–14, "[n]o one directed [him] to block that email," *id.* at 10:6, and that "parents and teachers were able to communicate" using Plaintiffs' two other e-mail addresses, *Id.* at 46:16–20.